STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Missouri,
Plaintiff-Respondent,

v.

SCHUTTE INVESTMENT COMPANY, a
Corporation, Defendant-Appellant.

No. 47400.

Supreme Court of Missouri,

Division No. 1.

April 11, 1960.

Robert J. Coleman, Hilary A. Bush, and Walter A. Raymond, Kansas City, for appellant.

Robert L. Hyder, Ralph H. Duggins, Jefferson City, for respondent.

WESTHUES, Judge.

Property of the Schutte Investment Company (being all of Lots 27, 28, 29 and 30, Block 10, Peery Place in Kansas City, Missouri) was condemned by the State Highway Commission for road purposes. Com-

missioners assessed the value of the property at $35,000. The State and the Investment Company both filed exceptions. A trial before a jury in the Circuit Court of Jackson County, Missouri, resulted in a verdict of $27,542 in favor of the owner, the Investment Company. The owner appealed from the judgment entered.

█ The Schutte Investment Company (hereinafter referred to as Schutte) claimed damages in the sum of $58,375 and offered evidence in support of such an amount. In the motion for new trial and on this appeal, it is claimed that the verdict is grossly inadequate. Appellate jurisdiction is here because of the amount in dispute. State ex rel. State Highway Commission v. Rauscher Chevrolet Co., Mo., 291 S.W.2d 89, loc. cit. 90(1), 55 A.L.R.2d 773. The State Highway Commission will be referred to hereafter as the State.

The condemnation proceedings were begun on October 8, 1956, although such proceedings had been contemplated for several years before the petition was filed. The only question in dispute is the value of the property taken by the State. The property taken was located on the northeast corner of Eleventh and Campbell Streets with a frontage on Campbell Street of 100 feet and 160 feet on Eleventh Street. All of the lots in question were taken so that the question of damages or benefits to property not taken is not in the case. Located on the property and facing Eleventh Street were seven three-story apartment buildings with full basements and a small building on the rear of the lots. These buildings were constructed about 70 years ago by "the Whyte family." They were occupied by tenants until 1955 when the buildings were declared to be uninhabitable by the city authorities of Kansas City, Missouri. Schutte purchased the property in February, 1956, from the Whyte estate trust for a price of $25,000.

█ On this appeal, the principal question briefed is that the verdict of the jury is grossly inadequate. Other questions briefed are that evidence was admitted which prej-

udicially affected the jury verdict and that instruction No. 4, given for the State, unduly limited the jury in considering the measure of damages. Of the six points briefed on behalf of Schutte, we shall consider the first, second, and sixth together. They are (omitting citations) as follows: "I. Article I, Section 26, Missouri Constitution, 1945, Guarantees Defendant Just Compensation for Its Property. The State As Represented in This Proceeding by the Trial Judge and the State Highway Department Were Under the Duty to Protect Defendant in Its Constitutional Rights in Such Respect." "II. This Court on Appeal Has the Authority, Jurisdiction and Duty to Reverse and Remand This Case for a New Trial on the Ground There Is No Substantial Evidence to Support It, or on the Ground of the Inadequacy of the Verdict upon Finding Defendant's Assignment of Failure of Proof or Inadequacy in Its Motion for New Trial Is Sustained by the Record." "VI. The Trial Court Abused Its Judicial Discretion in Overruling Defendant's Motion for a New Trial on the Ground of Inadequacy of the Verdict. The Cumulative Effect of the Prejudicial Matter Brought to the Attention of the Jury by Plaintiff and the Errors Committed Should Shock the Judicial Sense of Right and Create a Firm Conviction in the Mind of This Court That the Ends of Justice Will Be Best Served by Reversing This Cause and Remanding It for a New Trial on the Issue of Damages."

It is not pointed out in the brief under assignment No. I wherein the trial judge or the State failed to perform their respective duties. For the purposes of this case, we may agree with the abstract statement made. Therefore, no discussion of the point or citation of authority is necessary.

A consideration of assignments II and VI requires an examination of the evidence. To determine whether the jury verdict is grossly inadequate, we shall begin with the evidence as to the value of the lots without any buildings thereon. Further, we shall give due consideration to the evidence in-

troduced by the owner of the property. Mr. James Flanagan, a real estate broker, testifying for Schutte, placed the value of the land without the buildings at $32,000. On being asked what would be the cost of clearing the lots or of removing the buildings, he answered, "I estimated that it would probably cost around five to six thousand dollars to remove." Another witness for Schutte, George E. McIntyre, placed the value of the land at $36,000. This witness had examined the property for Schutte with a view of rehabilitating it so as to comply with the city requirements for rental purposes. The State introduced evidence by real estate brokers who placed the value of the lots at $24,000. One witness placed the value at $24,000 "less, however, in my opinion, the cost of tearing down the improvements, which I estimated $3,000." It is evident that if the jury was justified in finding that the buildings were worthless the verdict was adequate.

The next question is, was the jury justified in finding that the buildings were worthless? And, further, were they a "detriment" to the land? We think the jury was justified in so finding. The theory of Schutte was that the property could be rehabilitated by expending about $31,000 so as to comply with the requirements prescribed by the city authorities; that after such an expenditure, the property would be worth $58,375. This valuation, as we understand it, was based on the following: It was estimated that the reconstruction costs of the buildings would be $286,400; that because of the age, 70 years, the property had depreciated 75 to 80% which reduced the value of the buildings to $83,000. By making an expenditure of about $31,000 so as to comply with the minimum requirements of the city, the property could be made into cheap rental units so as to produce $12,000 or $15,000 per year; that taking into consideration all of the above factors, the reasonable value of the property would be $58,-375. The calculation was made by Albert Schoenberg, a real estate consultant. Some of his conclusions were based upon reports made to him by George E. McIntyre, an architect-engineer, who had inspected the buildings for the purpose of placing a value thereon and to determine the cost of rehabilitating the property.

The evidence introduced by Schutte disclosed a number of flaws in the above calculation. A report of the city showing the condition of the property and the repairs necessary to place the buildings in a condition to meet the minimum requirements was introduced in evidence. McIntyre testified that $31,625 would be sufficient to repair the buildings so as to meet the city requirements; that he used the city report to determine what was necessary to rehabilitate the property. Evidence by McIntyre and Schoenberg was that the condition of the foundation walls and the footings was very good and needed practically no repair, "just a little cleaning up." Schoenberg stated, "The floors were all right. There wasn't a sag, as far as I could determine. The stairs were solid, and we could not determine any sagging or anything else as far as sinking was concerned." McIntyre testified that his estimate of $31,625 did not contemplate any work on the roof. As mentioned above, McIntyre used the city's report to determine what repairs were needed. This report included specific references to needs of each unit as well as a general report on all of the property. This report shows that at 900 East Eleventh Street, among many other repairs needed, "New roof required"; that at 902 East Eleventh, "Plaster off in large areas—very bad. Floor in 3d floor hall rotted and drainage from ice boxes"; that at 906 East Eleventh, "Roof repairs needed." The report showed that at 908 and 912 East Eleventh, the roof leaked. The items noted are but a few mentioned in the detailed report as to each building. We referred to the above specifically to show that new roofs were required but McIntyre's estimate of the cost of repairs did not include new roofs. This the jury was justified in finding was a major item and would cost at least several thousand dollars. McIntyre's estimate evidently covered patch

work here and there when, in fact, it required a job of much greater magnitude than McIntyre contemplated to place the buildings in proper condition.

As mentioned above, Schutte introduced evidence by witnesses that the stairs and floors were in good condition. We quote only a few of the items from the city's report pertaining to the buildings in general:

"5. Sandstone facing all around building has deteriorated badly; spalling has created hazardous condition; should be removed and refaced.

"6. Main brick walls, including parapets, need striking and repointing.

"7. Most of the window frames and sash have rotted out; not weather-tight—Need replacing.

"8. Several girders and supports under first floor have rotted out; need replacing.

"9. The risers and treads in most of the inside stairways have settled and pulled away from the wall skirting."

The above items were taken from the original report made by the city. It was sent to Schoenberg with a letter dated February 23, 1956. McIntyre testified he used this report in making his report to Schoenberg as to the cost of making repairs on the buildings. McIntyre's report was introduced in evidence by the State as Exhibit No. 3. It contained a purported copy of the city's report. Schutte had the letter and the orginal report identified as Exhibit No. 1 but did not offer them in evidence. Schutte's lawyer, however, read Exhibit No. 3 to the jury. The purported copy in Exhibit 3 omitted item No. 8 of the city's report which we have included in the quotation above. No explanation was made for the omission. Exhibit No. 1 and Exhibit No. 3 were filed in this court as a part of the record of the case.

Louis Schutte, President of the Schutte Investment Company, a witness in rebuttal, testified that he examined the buildings before the purchase was made. We quote a portion of his evidence:

"Q. (By Mr. Coleman) Now, Mr. Reid testified that the stairways were pulled away from the walls. Did you find that condition to exist when you made your examination? A. Might have been a few of them pulled away.

"Q. The stairways? A. The stairways.

"Q. Did you notice a lot of rotten wood in the building? A. None at all.

\* \* \* \* \* \*

"Q. Did you determine and do you know of your own knowledge what it would cost to put it in shape to rent it? A. We determined, but at this time I can't tell just what it was, but I have the bids.

"Q. You don't recall at this time the nature of each one of the bids? A. No, sir.

"Q. So you are not prepared to say just what it was going to cost you? A. No, sir."

It is evident that the witnesses testifying for Schutte gave evidence indicating that in their opinion the condition of the buildings was not as bad as shown by the city's report. A jury was justified in finding that the cost of repairs would greatly exceed the estimate made by McIntyre. Further, a jury could well find that the buildings were in such a condition that a prudent investor would not attempt to rehabilitate such structures.

The State introduced evidence by a number of real estate brokers which, in substance, was that the buildings had deteriorated to such an extent that it would be unprofitable to make repairs. We need not detail this evidence because we are of the opinion that a jury was justified in concluding from the evidence introduced by Schutte that the buildings detracted from

the value of the land. We, therefore, rule that there was substantial evidence to support the verdict, that the amount was adequate, and that the trial court did not abuse "Its Judicial Discretion in Overruling Defendant's Motion for a New Trial on the Ground of Inadequacy of the Verdict" as claimed in point VI of the brief.

 Point III of Schutte's brief reads as follows: "The Court Erred in Admitting Evidence of the Price Paid for the Property in Question in February, 1956, Before It Was Taken in Condemnation in July, 1957, over Defendant's Objection That the Evidence Was Incompetent, That the Sale to Defendant Was Not An Arm's Length Sale, but the Property Was Bought from an Estate That Couldn't Afford to Rehabilitate the Property and That Because of the Time Lapse the Purchase Price Was Not Competent to Prove the Fair Market Value at the Time of Taking." The contention made that the Whyte estate trust could not afford to rehabilitate the property is not supported by the evidence. While witness Schoenberg was testifying, the following occurred:

"Q. From whom was the purchase made? A. From the Whyte estate trust.

"Q. At the time the Schutte family purchased this property was it in operation or not? A. No, it was vacant.

"Q. Do you know the reason? A. Yes, the reason was because the Whyte—

"Mr. Duggins: I object to that as a conclusion, Your Honor, hearsay.

"The Court: Sustained."

No offer of proof was made. 88 C.J.S. Trial § 74, p. 179. No one connected with the Whyte estate trust was called as a witness. In the brief, it is stated that the Whyte estate could not afford to make the necessary repairs. Evidently, the Whyte estate was in trusteeship. If that be true, it could well be that the trustee or trustees

could not afford to expend a large sum of money to rehabilitate the property because it would be considered a very bad investment for the trust estate. Under the showing made in this case, a court of equity could well hold a trustee guilty of mismanagement if such an expense had been incurred. Furthermore, the evidence introduced by Schutte does not indicate that the Whyte estate made a poor sale. The other argument that the sale price should not have been shown because of the time lapse between the date of sale, February, 1956, and July, 1957, when the State deposited the money in court in the condemnation suit, is without merit. The evidence does not indicate that there was a material change in the market value of the property between February, 1956, and July, 1957. As to the admissibility of such evidence, see the case cited in Schutte's brief of State ex rel. State Highway Commission v. Rauscher Chevrolet Co., supra, 291 S.W. 2d loc. cit. 92(3–6), where this court said, "It is the established rule in this state, and generally, that the price an owner paid for property being condemned is admissible as some evidence of its value at the time of appropriation. That rule applies unless circumstances appear which destroy the relevancy or probative value of that otherwise relevant and highly important evidence. For example, the purchase must have been recent and not remote in point of time. Marked changes in conditions or values must not have occurred since the sale. The sale must have been voluntary in the sense that the seller and buyer were each capable and desirous of protecting his interest. The sale must not have been a forced sale, such as a tax or foreclosure sale." Many cases were there cited to support the rule. We do not find anything in the record before us that would have justified the rejection of the sale price as some evidence of the value of the property.

 In point IV of the Schutte brief, it is contended that the State committed error in raising a false issue, that is,

Schutte's knowledge of the contemplated condemnation, and in making it appear that the property was purchased in the hope of making the State "pay more for the property." There is no merit in this point. Schutte's lawyer read Exhibit No. 3 to the jury. This exhibit included a purported copy of the city's report showing the requirements to be met before the property would be in a condition to be rented. In this report, which Schutte's agent received before the purchase was made, we note the following: "14. This property is included in the right-of-way limits for the Campbell Street Freeway Loop as indicated on Map (Sec. D–2) on file in the City Plan Commissioner's office." Furthermore, Albert Schoenberg, Schutte's agent, when asked on direct examination the reason for the delay in repairing the buildings, answered that the city had asked to have the matter delayed because of the contemplated condemnation; that the State was waiting for an appropriation bill to be signed by the President "so the State could have more money"; that the repairs were delayed on that account. This witness further testified that, due to the delay, Schutte was compelled to expend sums to protect the property and that the buildings suffered further deterioration. In the brief, it is contended that Schoenberg did not definitely know that the property was to be taken until July, 1957; that Schutte did not know at the time the property was purchased that it was to be condemned. The record shows beyond question that Schoenberg did know before the property was purchased that condemnation was contemplated. Schoenberg negotiated the sale for Schutte. True, a condemnation proceeding may be abandoned and there is not absolute certainty about the fact until, as in this case, the State pays the money into court for the benefit of the property owner. Hamer v. State Highway Commission, Mo., 304 S.W.2d 869. In the brief, it is said, "Plaintiff's counsel (meaning counsel for the State) although having dragged this false issue into the case ob-

jected and tried to prevent Mr. Schutte's explanation." The record shows that when counsel for Schutte first interrogated Schoenberg about this subject matter, the State's counsel objected, but was overruled. Schutte, having injected the matter into the case for the purpose of deriving a benefit, is in no position to complain. 88 C.J.S. Trial § 116, p. 236; 31 C.J.S. Evidence § 190, p. 913.

■ Schutte complained of instruction No. 4 which reads, "The Court instructs you that in determining the damages to which the defendant is entitled for the taking and appropriating by plaintiff of their property, you will find the fair, reasonable market value of the whole of defendant's property as it stood on the date of the appropriation by plaintiff, and not such value that is due to some future use, nor such value that arises from possible or future improvements made to the property which are speculative." The trial court gave an instruction (No. 1) at Schutte's request which concluded by stating, "and you are instructed to award for this tract the sum which you find and believe from the evidence to be its fair market value in July, 1957." We are of the opinion that instruction No. 4 in no way restricted the jury in making an award to Schutte for the full market value of the property taken.

■ It is said in the brief that instruction No. 4 prohibited the jury from considering the availability of such property for other uses. It must be kept in mind that the State appropriated all of the property. As a rule, the question of other uses and future uses as affecting the market value of property taken arises in cases where only a portion of land is taken. It then becomes important, on the question of market value, the uses for which, if any, the remaining portion may be utilized. See State ex rel. State Highway Commission v. Cox, 336 Mo. 271, 77 S.W.2d 116; State ex rel. State Highway Commission of Missouri v. Fenix, Mo.App., 311 S.W. 2d 61; KAMO Electric Co-op., Inc. v.

Baker, 365 Mo. 814, 287 S.W.2d 858; City of St. Louis v. Paramount Shoe Mfg. Co., 237 Mo.App. 200, 168 S.W.2d 149. Schutte, the owner of the property in question, was not prohibited in any way by the trial court from showing the market value of the land for any purpose or use. The disputed question was whether the buildings were of any value. Schutte's theory was that the buildings could be rehabilitated for rental as cheap apartments by expending about $31,000 for repairs. Schutte's evidence was that the property would be of no use for any other purpose. If the buildings were not worth repairing, they certainly would not add to the market value of the land. In other words, the market value of the property in its condition on the day of the appropriation was the proper yardstick to measure Schutte's damages. In re Armory Site in Kansas City, Mo., 282 S.W.2d 464, loc. cit. 471–473 (16–21); City Water Co. of Sedalia v. Hunter, 319 Mo. 1240, 6 S.W. 2d 565, 566, 567(4) (5).

In the In re Armory case, supra, this court said, 282 S.W.2d loc. cit. 472: "The landowner may and did show that the land was adaptable for use as building sites. State ex rel. State Highway Commission v. Graham, Mo.App., 74 S.W.2d 493. But the measure of just compensation to which the owner of land is entitled by law to receive for the taking of his land by condemnation is not the value of the land at some future date after it has been improved at considerable cost to make it usable for a purpose for which he claims it to be reasonably adaptable. The Sedalia, Warsaw & Southern Railway Co. v. Abell, 18 Mo.App. 632; 4 Nichols, Eminent Domain (3rd ed.) § 12.3142. It is the present value for the adaptable use that should be determined by the jury." That rule is applicable to the present case.

We have considered all points briefed and find them to be without merit.

The judgment is hereby affirmed.

All concur.